UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| DESIREE POLLARD, | ) | | |
| for T.W., | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 4:07CV1054 DJS |
| | ) | (FRB) |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

## I. Procedural History

On October 12, 2005, plaintiff Desiree Pollard filed an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., on behalf of her fifteen-year-old daughter, T.W., in which plaintiff claimed that T.W. became disabled on December 1, 1990. (Tr. 45-47.) On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 19, 40-44.) On September 28, 2006, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 206-26.) T.W. testified and

was represented by counsel. T.W.'s mother, the plaintiff here, also testified at the hearing. On November 9, 2006, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 8-18.) On May 9, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 3-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A.  <u>Testimony of Plaintiff</u>

At the hearing on September 28, 2006, plaintiff Desiree Pollard testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she is T.W.'s mother and that T.W. is sixteen years of age. (Tr. 209.) Plaintiff testified that T.W. used to receive SSI benefits but that benefits ceased in 2000 or 2001 for the reason that the Social Security Administration determined that T.W. was no longer eligible for benefits. (Tr. 210.)

Plaintiff testified that T.W. has suffered from a hearing impairment since she was two years of age, with moderate loss of hearing in one ear and severe loss in the other. (Tr. 213.) Plaintiff testified that this hearing loss interfered with T.W.'s ability to learn speech properly. (Tr. 213-14.) Plaintiff testified that although T.W. is able to speak, she has a speech

impairment and prefers not to talk. (Tr. 210-11.) Plaintiff testified that while T.W. was growing up, it appeared that T.W. did not understand her mother's communication so plaintiff communicated with T.W. through gestures. Plaintiff testified that she took T.W. to Children's Hospital and to CID (Central Institute for the Deaf) at which time T.W.'s hearing loss was discovered. (Tr. 213-14.) Plaintiff testified that in addition to her hearing impairment, T.W. has only one kidney and also has sickle cell trait. (Tr. 210.)

Plaintiff testified that T.W. attends school at the Missouri School for the Deaf (MSD) in Fulton, Missouri, where she resides during the week. Plaintiff testified that T.W. comes home from MSD on the weekends. (Tr. 209-10.) Plaintiff testified T.W. began attending MSD in January 2005. Plaintiff testified that one of the reasons for T.W.'s enrollment at MSD was for T.W. to become more proficient at sign language. Plaintiff testified that T.W. reads lips well. (Tr. 210-11.)

Plaintiff testified that prior to T.W.'s attendance at MSD, T.W. attended a local public school but experienced problems there which led to her being removed from that school. Plaintiff testified that T.W. was teased at her former school about her manner of speaking and about her hearing aids. Plaintiff testified that other children wanted to take T.W.'s hearing aids from her, and that T.W. would get into fights on account of such situations.

(Tr. 211.) Plaintiff testified that T.W. did not perform well academically at the regular school despite some accommodation. (Tr. 211-12.)

Plaintiff testified that MSD accommodates T.W.'s speech and hearing impairments and that T.W. has been on the honor roll since attending MSD. Plaintiff testified that T.W. lives in a dormitory at MSD and that this residential setting likewise has accommodations for her impairments, including special telephones to assist in communication. (Tr. 212-13.) Plaintiff testified that she purchased such a telephone for T.W. to use when she is home on weekends. (Tr. 211-13.)

Plaintiff testified that she and T.W. are now able to communicate with each other. Plaintiff testified that T.W. watches her and reads her lips. Plaintiff testified that T.W. speaks rapidly. Plaintiff testified that she cannot understand T.W. when she speaks so rapidly and that she must tell T.W. to slow down and to start over. Plaintiff testified that T.W. gets agitated with this and sometimes leaves in frustration. Plaintiff testified that T.W. also walks off when she tries to communicate with other people and they are unable to understand her. (Tr. 214.)

Plaintiff testified that T.W. has one close friend and has had sleepovers with this friend. (Tr. 214-15.) Plaintiff testified that another close friend has moved away but comes to visit when she is in the neighborhood. Plaintiff testified that

T.W. has never had a group of friends because of the communication difficulties and because other children tease T.W. on account of her speech. (Tr. 215.)

Plaintiff testified that it is difficult for her to send T.W. to live in Fulton but that she has to do what is best for T.W. Plaintiff testified that she sometimes makes the two-and-one-half-hour drive to Fulton to see T.W. and will call her when she really misses her. (Tr. 215.)

Plaintiff testified that T.W. is a cheerleader for the deaf at MSD and that she plays volleyball, basketball and runs track. (Tr. 217.) Plaintiff testified that T.W. has a driving permit but with a noted restriction regarding her hearing impairment. (Tr. 209-10.)

B.   Testimony of T.W.

T.W. testified at the hearing in response to questions posed by the ALJ and counsel. Although a sign language interpreter was requested for the hearing, one was not available. T.W. testified that she could listen to the questions as well as read lips, but that she could read lips better. (Tr. 219.) T.W. responded orally to the questions posed. (Tr. 217.)

T.W. testified that she began school in the first grade with the assistance of an interpreter, but that after a year and a half, she was mainstreamed and no longer had such assistance. T.W. testified that she thereafter began experiencing difficulty in

school. (Tr. 223.) T.W. testified that she had difficulty because the teacher would sometimes turn her back to her and she could not understand the teacher. T.W. testified that she did not participate in any sports or extracurricular activities at the regular school. (Tr. 218.)

T.W. testified that she entered MSD in the middle of eighth grade and likes the school because they sign and have communications and social skills that T.W. can understand. (Tr. 218-19.) T.W. testified that she is the captain of her cheer squad at MSD and is one of two cheerleaders who can speak. T.W. testified that she can project her voice while cheering and cues the other cheerleaders with clapping. (Tr. 224.) T.W. testified that she was currently in the tenth grade at MSD and planned to attend college after high school to become a teacher for the deaf, or possibly the National Technician School for the Deaf to become a cosmetologist. (Tr. 225.)

T.W. testified that she obtained her driver's permit the second or third time she took the test and that her mother sometimes lets her drive. (Tr. 219.) T.W. testified that she has chores to perform while at MSD as well as at home with her mother. T.W. testified that she regularly cleans her dormitory room when she is at school. (Tr. 221.)

T.W. testified that she has been reading lips since she was little. (Tr. 220.) T.W. testified that she began learning

sign language in the early childhood learning center when she was two or three years of age. (Tr. 222.) T.W. testified that she also communicates with her friends currently through text messaging. (Tr. 221.)

T.W. testified that, in addition to the two friends her mother spoke of, she has another friend who attends MSD and visits her at her house. (Tr. 219-20.) T.W. testified that they watch movies and play cards together. T.W. testified that she had only a few friends from the regular school and that she had difficulty with friendships there because of communication problems. She could not understand them and they could not understand her. T.W. testified that she gets frustrated when people do not understand her because they continue to question her. T.W. testified that she just walks away when this happens. (Tr. 220.) T.W. testified that she is more comfortable around deaf people because of the way they communicate, socialize, and experience the same disability. (Tr. 222.)

### III. Medical and School Records

On November 12, 1998, a comprehensive evaluation was performed by the St. Louis County Special School District in relation to T.W.'s Individualized Education Program (IEP). (Tr. 146-47.) It was noted that T.W.'s educational diagnosis was "hard of hearing." T.W. was noted to be in good health. It was noted that T.W. recently failed a vision screening and that her last

audiological evaluation reported no change in her hearing loss. T.W.'s hearing loss was determined to be moderate to severe bilaterally.  It was noted that T.W. was "audiometrically hard of hearing" and that she used binaural hearing aids and the Comtek FM system.[1]  (Tr. 147.)  It was noted that T.W. received satisfactory evaluation on her 1998-99 first quarter report card, but that the areas of vocabulary and language structure were areas of concern due to her hearing loss.  It was also noted that T.W. continued to demonstrate behaviors consistent with her hearing loss in language form, content and use.  No further testing was needed to confirm T.W.'s disability.  (Tr. 147.)  Additional areas of concern included speech articulation, vocabulary development and use, oral and written language skills, and conversational language skills. It was noted that T.W. participated in the regular second grade curriculum and received interpreting services in accessing the curriculum.  It was also noted that vocabulary and language concepts were taught through a multi-sensory approach and that T.W. received speech/language therapy daily.  No additional action with respect to T.W.'s IEP was requested.  (Tr. 146.)

T.W. visited the John C. Murphy Health Center on June 16, 2004, with complaints of having an earache.  T.W.'s health history

---

[1]The Comtek FM system is an assistive listening device whereby the speaker wears a microphone which transmits the speaker's voice to a personal receiver worn by the hearing impaired person.  Comtek Communications Technology, *available at* <http://www.comtek.com/ assistive_listening/at216.html>.

was noted to include hearing loss and use of hearing aids, having sickle cell trait, and having one kidney. (Tr. 151-53.)

On January 28, 2005, the Missouri School for the Deaf (MSD) conducted an evaluation of T.W.'s IEP. (Tr. 123-41.) It was noted that T.W. was in the eighth grade and was attending Wheeler Middle School within the MSD agency. (Tr. 123.) T.W.'s present level of educational performance was summarized as follows:

> [T.W.] has a moderate to severe-profound bilateral hearing loss. She received new hearing aids in the fall of 2003 and receives good benefit from them. Her hearing loss has impacted her access to the general curriculum for all areas involving language including delayed vocabulary development and all aspects of oral and written language. She communicates using verbal skills and sign language. Her speech production is very clear with limited errors in articulation. However she needs to be able to choose ways to correct her speech when not understood by others in conversation. She needs to work on her conversational speech rate, clarity of production and speech reading skills. She uses glasses for best vision. No health or motor skills concerns are noted.
>
> When signing, she has difficulty at this time with sign choice by others. She is limited to specific signs that she thinks mean specific English words and wants to correct others when they sign, including staff. She can be inflexible when presented with new signs and concepts but this will resolve over time. She does not have background experience in American Sign Language but is usually able to understand others and make herself understood by others through continued discussion. Information from her previous placement indicated excellent signing skills but this may have been through Signing Exact English.

However staff at MSD has not seen what would be excellent skills even for Signing Exact English. . . .

Evaluation results reviewed in 2000 indicated non-verbal functioning in the borderline range and verbal functioning in the below average range. There were concerns at that time about her difficulty attending to the testing and being highly distractible during testing. Review of data was also done on 12/09/04 and an area of concern was social/emotional adjustment. However no testing results are available. It appears that performance testing was redone at that time with much better results. Assessment results from the Spring of 2004 indicated reading skills for vocabulary and comprehension were below grade level and at about the 4th/5th grade level. MAP testing placed her at Step 1 for science and at Progressing for Communication Arts.

(Tr. 124.)

It was also noted that T.W. was performing at grade level in math, was able to write organized paragraphs with good English structures, was able to read at grade level with adequate comprehension, and had adequate sight vocabulary. (Tr. 124.) Goals were identified for T.W. and various strategies were set out by which the IEP would assist T.W. in achieving those goals. (Tr. 126-31.) It was noted that T.W. would receive special education services with modifications and accommodations at a public residential facility, and specifically, the Missouri School for the Deaf. (Tr. 132, 134, 137-40.)

During the latter half of the 2004-2005 school year, T.W. was in the eighth grade at MSD and received primarily A and B

grades for the third and fourth quarters. (Tr. 87-88.)

T.W. visited the Center for Hearing and Speech on June 22, 2005, for hearing examination and hearing aid check. (Tr. 158-59.) A pure tone audiometry performed showed the left ear to have the following hearing level: at 500 Hertz (Hz), 55 decibels (dB); at 1000 Hz, 70 db; and at 2000 Hz, 75 dB. The right ear was shown to have the following hearing level: at 500 Hz, 65 dB; at 1000 dB, 75 dB; at 2000 Hz, 80 dB; and at 3000 Hz, 80 dB. Speech audiometry examination showed T.W. to have speech reception threshold (SRT) in the right ear at a level of 65 dB with 72% speech recognition; and SRT of 65 dB in the left ear with 88% speech recognition.[2] Audiologist M. Lowe noted there to be no significant changes in T.W.'s hearing since her last examination in March 2004. (Tr. 159.) T.W. reported that her school uses an FM system and she requested that she be able to use an FM system at home. (Tr. 158.)

On August 10, 2005, T.W. visited the Center for Hearing and Speech to pick up new and/or repaired hearing aids. No feedback was noted and the electromagnetic fields were noted to be good. T.W. requested that her hearing aid AV level be increased. (Tr. 157.)

On September 26, 2005, T.W. underwent a hearing examination at MSD. (Tr. 154-55.) A pure tone audiogram performed with inserted earphones showed T.W.'s right ear to have the

_____

[2]This record is unclear as to whether this audiogram was performed with or without the use of hearing aids.

following hearing level: at 500 Hz, 50 dB; at 1000 Hz, 80 db; at 2000 Hz, 85 dB; and at 3000 Hz, 90 dB. The left ear was shown to have the following hearing level: at 500 Hz, 60 dB; at 1000 dB, 70 dB; at 2000 Hz, 75 dB; and at 3000 Hz, 75 dB. T.W.'s unaided speech audiometry was measured as follows: speech reception threshold, 55 dB in each ear; and speech discrimination score, 84% in each ear. The most comfortable loudness (MCL) level in each ear was measured to be 85 dB, unaided. In aided performance, T.W.'s listening in the left ear was measured to be 30 dB, with a speech discrimination score of 84%. T.W.'s MCL level in the left ear was measured to be 55 dB, aided. In aided performance with listening and speech reading, T.W.'s speech discrimination score in the sound field was 92%. (Tr. 154.) It was noted that aided performance was measured in the left ear only because T.W.'s hearing aid for the right ear was unavailable as it was being repaired. (Tr. 154-55.) An aided audiogram performed in sound field showed T.W. to have the following hearing level: at 500 Hz, 35 dB; at 1000 Hz, 30 db; at 2000 Hz, 25 dB; and at 3000 Hz, 50 dB. (Tr. 154.) The audiologist, Dr. Amy Fleetwood, noted T.W. to speech read very well and that T.W. was learning sign language. Dr. Fleetwood noted the examination to show that T.W. had moderate to severe sensorineural hearing loss in the left ear and moderate to profound sensorineural hearing loss in the right ear. Dr. Fleetwood noted T.W.'s speech discrimination scores to be considered good to excellent

unaided/aided in both ears. Dr. Fleetwood recommended that T.W. be given preferential seating in the classroom with both ears to the teacher. Dr. Fleetwood also recommended that T.W. continue with "TC" as receptive/expressive mode of communication. It was noted that T.W. was a candidate for FM and that the issue would be addressed if T.W. was observed to be missing any audio information in the classroom. (Tr. 155.)

On January 4, 2006, T.W.'s IEP was reviewed by MSD. (Tr. 67-86.) It was noted that T.W. was in the ninth grade and was attending Wheeler High School/Coats Career and Technology Center within the MSD agency. (Tr. 86.) As to how T.W.'s disability affected her involvement and progress in the general curriculum, it was reported that T.W.

> benefits from being educated in an environment
> with complete access to academic and
> incidental information through ASL [American
> Sign Language]. Ongoing exposure to models of
> ASL would facilitate ASL and promote written
> English development. [T.W.] communicates
> using ASL and occasional voice assistance.
> [T.W.] benefits from direct instruction in ASL
> for access to the general curriculum because
> of her hearing loss.

(Tr. 84.)

T.W.'s strengths were noted to include her verbal skills, assertiveness and ability to make herself understood. It was noted, however, that T.W. needed to continue to improve her ASL skills and be willing to accept correction in that area. T.W.'s

freshman orientation teacher placed T.W. at the intermediate level in ASL communication. T.W. was also noted to have strengths in reading, to have a good base to her vocabulary, and to be progressing in academics. It was noted that T.W.'s reading was at grade level but that she continued to show weakness in the quality of her writing. T.W. was noted to be doing well in math. It was noted that in biology, T.W. did not stay in her seat and was a distraction to her classmates. It was noted that T.W. scored at Step 1 on the general state MAP test in March 2005, and that she tested at grade level in math at that time. It was also noted that T.W.'s scores on the February 2005 district-wide Stanford Achievement Test (SAT) showed her to be below grade level in many areas, but that she was at grade level in spelling and in math. (Tr. 84.) Finally, it was reported that

> [d]uring class discussions peers make mistakes or use their voices and [T.W.] is quick to criticize them to the point of becoming disruptive in class, and [T.W.] does not like to be corrected herself. [T.W.] is reported in several classes not to get along with her peers and is not willing to work with others as a team. She has some difficulty with too much physical contact that is not appropriate. [T.W.] wants attention and gains it often in an inappropriate way. [T.W.] often wants to have the last word in a discussion and may make physical contact with another person in an aggressive way to make her point or statement. [T.W.] has been reported to shut down communication when she is angry or confused. [T.W.] attempts to argue with the teacher about assignments and has difficulty getting on task, and resists feedback on how

> to improve her work. [T.W.] does not follow the teachers [sic] request, for example walking around the room when she should be seated distracting the class, this behavior slows her progress. She has been known to have an attitude problem toward her peers because of competition between students that are academic achievers. [T.W.] uses speed of communication when defensive; it does not always equal proficiency.

(Tr. 84.)

Goals were identified for T.W., specifically in the areas of written English and self management with peers, teachers and task behavior; and various strategies were set out by which the IEP would assist T.W. in achieving those goals. (Tr. 79-82.) It was noted that T.W. would receive special education services with modifications and accommodations at a separate school facility, and specifically, the Missouri School for the Deaf. (Tr. 69-72, 76-78, 86.)

On February 17, 2006, T.W. underwent speech and language evaluation for disability determinations at City Speech, Inc. (Tr. 161-76.) Upon administration of the Clinical Evaluation of Language Fundamentals-Fourth Edition and the Goldman-Fristoe Test of Articulation-Second Edition, as well as engaging in informal speech and language assessment, Speech-Language Pathologist Jennifer Henkhaus made the following observations and recommendations:

> [T.W.'s] receptive language skills were

formally assessed to be just within the range
of average limits when compared to same-aged
peers. She received one subtest score just
below average limits on formal testing, as she
demonstrated difficulty grouping two words out
of four by class. This indicates relative
weakness in receptive vocabulary. [T.W.'s]
expressive language skills were formally
assessed to be mildly impaired when compared
to same-aged peers. She demonstrated
significant difficulty repeating sentences
verbatim. It should be noted that this
subtest has a strong auditory component.
Informal assessment results were consistent
with formal test results, and revealed good
conversational skills. [T.W.'s] speech was at
least 95% intelligible within a known context
and at least 85% intelligible when context was
known to this trained listener despite
articulation errors related to her hearing
loss. Intelligibility is likely to be
slightly less for untrained listeners. [T.W.]
demonstrates good conversational skills, and
her receptive and expressive language skills,
while mildly impaired, are functional. Her
articulation errors related to her hearing
loss will adversely affect her ability to
clearly communicate her thoughts and ideas,
especially to unfamiliar listeners, upon her
first attempt. She demonstrates good use of
strategies to clarify her messages with
repetition.

(Tr. 163.)

Ms. Henkhaus diagnosed T.W. with mild expressive language disorder,

expressive language weaknesses, and articulation errors. Ms.

Henkhaus opined that T.W.'s "[p]rognosis for attaining age-

appropriate receptive and expressive language skills is good with

continued formal intervention. Prognosis for continuing to attain

improved articulation skills is also considered to be good with

continued formal intervention given her current ability to monitor her speech skills." (Tr. 163.)

During the 2005-2006 school year, T.W. was in the ninth grade at MSD and received primarily A and B grades for each quarter. (Tr. 89.)

On June 8, 2006, T.W. underwent a general well-child examination at John C. Murphy Health Center. It was noted that T.W. had average school performance, interacted normally with her family, had friends, and participated in activities. T.W. was in good general health with hearing loss noted. (Tr. 194.)

On September 7-8, 2006, Maureen Fisher and M. Lowe of the Center for Hearing and Speech completed portions of a Child Functioning Questionnaire in which they opined that T.W. had extreme limitations in the domain of Acquiring and Using Information, and specifically, in the areas of understanding and following verbal instructions. It was noted that T.W. could not hear normal conversational speech without hearing aids and that, although T.W. receives benefit from hearing aids, she communicates best when visual and auditory information is available. (Tr. 184.) Neither Ms. Fisher nor M. Lowe gave an opinion in other domains of functioning for the stated reason that their contact with T.W. was limited to audiology and related issues. (Tr. 190.)

On September 25, 2006, Deborah Ripley, teacher and advisor at the Missouri School for the Deaf; and Juanita Knipp, the

school nurse, completed a Child Functioning Questionnaire.  In the domain of Acquiring and Using Information, Ms. Ripley and Ms. Knipp opined that T.W. experienced marked difficulties in the areas of understanding and following verbal instructions and moderate difficulties in the areas of learning new material, recalling previously learned materials, demonstrating problem solving skills, using appropriate vocabulary, and comprehending written instructions.  It was specifically noted in this domain that T.W. "acquires and learns information at an average rate[.  S]he appears to use information as it would best benefit her.  [T.W.] may have a delay or slightly below grade or age level due to hearing loss." (Tr. 57.)  In the domain of Interacting and Relating with Others, Ms. Ripley and Ms. Knipp opined that T.W. experienced marked difficulties in the areas of getting along with other children, getting along with authority figures, being disruptive and talking out of turn, respecting authority and being obedient, and due to unprovoked hostility or anger.  They further opined that T.W. had moderate difficulties in the areas of sharing and taking turns, interacting appropriately with adults, talking constantly and unable to stop talking, and being understood by others on the first effort.  It was specifically noted in this domain that T.W. was "not shy and is able to initiate conversation – not always appropriate for a classroom setting.  She is very social, but is not always liked by peers.  In most of her classes, she is reported

to be disruptive and argumentative with teachers and peers often, but not always." (Tr. 58.) In the domain of Attending and Completing Tasks, Ms. Ripley and Ms. Knipp opined that T.W. had marked difficulties in the areas of able to change activities without needing redirection from adults, perseveres and keeps pace with peers, after interruptions is able to return to a task without reminders to finish, able to tolerate frustration, control the impulse to blurt out answers, and doing tasks without bothering others. They also opined that T.W. had moderate difficulties in the areas of able to maintain focus during group activity, able to take turns and change activity when appropriate, attends to speaker when spoken to directly, easily distracted, following through on instructions, completing tasks on time, daydreams, pays attention, and stays on tasks without being reminded. It was specifically noted that T.W.

> tends to be the distraction – and wants attention in the classroom. When pull on task she argues and escalates occasionally outburst. [sic] She may blurt out answers and argues if she is wrong or has the incorrect answer. She is able to focus, but chooses not to do so more often than her peers.

(Tr. 59.)

In the domain of Moving About and Manipulating Objections, Ms. Ripley and Ms. Knipp opined that T.W. had no difficulties in the domain. (Tr. 60.) In the domain of Caring for Self, Ms. Ripley

and Ms. Knipp opined that T.W. had moderate difficulties in the areas of using public facilities properly, following through on reaching goals, and spontaneously pursuing enjoyable activities or interests. It was specifically noted that T.W. would have some difficulty with the use of a public telephone because of her hearing ability, but that she compensates with a high level of text messaging skills. It was also noted that T.W. chooses not to complete follow through on goals. (Tr. 61.) Finally, in the domain of Health and Physical Well Being, Ms. Ripley and Ms. Knipp opined that T.W. experienced no difficulties. (Tr. 62.)

## V. The ALJ's Decision

The ALJ found T.W. never to have engaged in substantial gainful activity. (Tr. 17.) The ALJ found T.W.'s medically determinable impairments of mildly impaired receptive and expressive language skills to be severe, but that such impairments did not meet, medically equal, or functionally equal the severity of any appropriate impairment in the Listings of Impairments. The ALJ found the allegations of disability not to be credible. The ALJ determined T.W. not to have an impairment or combination of impairments which resulted in marked and severe functional limitations. The ALJ thus determined T.W. not to be under a disability at any time since the protective filing date of her application for benefits, that is, October 11, 2005. (Tr. 18.)

## VI. Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income (SSI) under the Social Security Act if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations. 20 C.F.R. § 416.924(a); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. Garrett, 366 F.3d at 647. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations

caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a. To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad area of functioning, or "marked" limitations of functioning in two broad areas of functioning. 20 C.F.R. § 416.926a(a). If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. Id. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Id.

In this cause, plaintiff claims that the ALJ failed to

properly consider Listing 102.08 – Hearing Impairments, when he determined T.W.'s impairments not to meet any listed impairment. In addition, plaintiff contends that the ALJ legally erred in his determination that T.W.'s impairments do not functionally equal a listed impairment inasmuch as the ALJ relied on an improper burden of proof in evaluating the domain of Acquiring and Using Information; failed to consider the effect of T.W.'s structured and supportive settings on T.W.'s ability to function; and failed to fully and accurately analyze the domains as demonstrated by his failure to make a specific finding in each domain as to the level T.W. was limited therein.

A.    Listing 102.08

Plaintiff contends that T.W.'s hearing impairment meets Listing 102.08 and argues that the ALJ failed to properly consider this Listing when he determined T.W. impairments not to meet "any appropriate listing[.]"  (Tr. 12.)

At Step 3 of the sequential evaluation, the burden rests with the claimant to show that her impairment matches a listed impairment.  To meet this burden, the claimant must show that she meets all of the specified medical criteria of the Listing.  Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004).  To meet Listing 102.08 - Hearing Impairments, a child-claimant five years of age and above must have:

1.    Inability    to    hear    air    conduction

> thresholds at an average of 70 decibels (dB)
> or greater in the better ear;
>
> 2. Speech discrimination scores at 40
> percent or less in the better ear; or
>
> 3. Inability to hear air conduction
> thresholds at an average of 40 decibels (dB)
> or greater in the better ear, and a speech and
> language disorder which significantly affects
> the clarity and content of the speech and is
> attributable to the hearing impairment.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 102.08(B) (2006).

Plaintiff argues that T.W.'s September 2005 audiometry showed T.W. to have a speech reception threshold in aided listening of 30 dB, with an aided audiogram in sound field showing T.W. to have the ability to hear at an average frequency of approximately 38 dB. Plaintiff argues that these results show T.W. unable to hear at an average of 40 dB or greater, and that, when these results are coupled with T.W.'s speech and language disorder, T.W.'s hearing impairment is shown to meet the criteria of Listing 102.08(B)(3). Plaintiff's argument is misplaced.

Air conduction thresholds are measured by transmitting signals through the outer, middle and inner ear and then through the brain to the cortex. Such testing may be performed using headphones, insert earphones or sound fields; and the results of such testing are charted on a graph, known as an audiogram. E-Medicine, Audiology, Pure-Tone Testing (last updated Oct. 6, 2006), *at* http://www.emedicine.com/ent/topic311.htm. The loudness or

intensity of sound is shown on the graph by decibel level, with the smaller decibel numbers representing soft sounds and the larger decibel numbers representing loud sounds.  The loudness level for normal conversation is typically 60 dB; whereas the loudness level for whispering is typically 30 dB.  At each frequency tested, or Hz, the audiologist records on the graph the decibel level representing the *softest* tone that can be heard in each ear.  American Speech-Language-Hearing Ass'n, <u>Hearing Assessment</u>, *at* <u>http://www.asha.org/public/hearing/testing/assess.htm</u>.  As such, where the decibel level recorded on an audiogram is 40 dB, 40 dB is the *softest* tone that can be heard at that frequency.  Tones at decibel levels less than 40 cannot be heard; tones at decibel levels greater than 40 can be heard.

In processing claims for Social Security benefits, the Social Security Administration (SSA) uses the Program Operations Manual System (POMS) as a primary source of information providing guidance to SSA employees.  <u>See</u> Social Security Admin., <u>SSA's Program Operations Manual System</u>, *at* <u>https://secure.ssa.gov/apps10/poms.nsf/aboutpoms</u>.  With respect to the evaluation of hearing impairments, POMS Section DI 24535.010 states that the listing criteria of Listing 102.08 are based on how an individual hears with a hearing aid.  "Therefore, to determine that an impairment meets . . . 102.08, we usually need the results of hearing testing performed with a hearing aid in place (aided hearing testing)."

Id. at B.1. In addition, with respect to the phrase "inability to hear air conduction thresholds at an average of 40 decibels (dB) hearing level or greater" set out in Listing 102.08(B)(3), POMS Section DI 24535.010 directs that such average thresholds be obtained by averaging the air conduction thresholds at 500, 1000, 2000, and 3000 Hz. Id. at B.2.

Applying the directives set out in POMS Section DI 24535.010 to T.W.'s September 2005 aided audiogram in sound field, upon which plaintiff relies here, T.W. has an average air conduction threshold of 35 dB. Because such average shows T.W. to have the aided ability to hear tones softer than 40 dB, and specifically at 35 dB, and thus the aided ability to hear at 40 dB or greater, plaintiff cannot demonstrate that T.W. meets all of the medical criteria of Listing 102.08(B)(3). E.g., Scales v. Barnhart, 363 F.3d 699, 704-05 (8th Cir. 2004).

Accordingly, the ALJ's decision that T.W. did not meet any appropriate listing in the Listings of Impairments, albeit cursory, was not error. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (ALJ's inelaborate conclusion that claimant did not meet any listed impairment does not require reversal where record supports the conclusion).

B.    Functional Equivalence

Plaintiff also argues that the ALJ erred in his determination that T.W.'s impairments did not functionally equal a

listed impairment.

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing. To "functionally equal the Listings," the impairment must be of Listing-level severity, _i.e._, it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. _Id._ As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a).

Under the Social Security Regulations, a child-claimant has a "marked" limitation in a domain when her

> impairment(s) interferes seriously with [her]
> ability to independently initiate, sustain, or
> complete activities. [Her] day-to-day

> functioning may be seriously limited when
> [her] impairment(s) limits only one activity
> or when the interactive and cumulative effects
> of [her] impairment(s) limit several
> activities. "Marked" limitation also means a
> limitation that is "more than moderate" but
> "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner is to review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); <u>see also</u> 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [her] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5). For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner must consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting. 20 C.F.R. § 416.924a(b)(5)(iv).

A review of the ALJ's decision in this cause shows that

upon his summary of the evidence, he concluded that T.W. did not suffer marked or extreme limitations in the domains of Acquiring and Using Information, Interacting and Relating with Others, and Health and Physical Well-Being. The ALJ also concluded that T.W. had no limitations in the domains of Attending and Completing Tasks, Caring for Oneself, and Moving About and Manipulating Objects. (Tr. 15-17.) Plaintiff argues that the ALJ erred in these findings, first, by altering the burden of proof in the domain of Acquiring and Using Information in that he looked to T.W.'s "readiness" to acquire and use information rather than her actual abilities in this domain; second, by failing to consider how T.W.'s structured setting at MSD affects her functional limitations and how T.W. would function outside of this setting; and finally, by failing to specify the level of severity by which T.W. is limited in the domains of Acquiring and Using Information, Interacting and Relating with Others, and Health and Physical Well-Being.

1. *Opinion Writing Technique*

Plaintiff contends that the ALJ committed reversible error by finding that T.W.'s "readiness" to acquire and use information was sufficient to show her not to experience marked or extreme limitations in said domain. Plaintiff also contends that the ALJ committed reversible error by generally finding that T.W.'s limitations were not marked or extreme in the domains of Acquiring

and Using Information, Interacting and Relating with Others, and Health and Physical Well-Being, rather than specifically identifying whether she experienced no or moderate limitations in such domains. Plaintiff cites to no authority, however, and the undersigned is aware of none, which requires reversal in such circumstances. <u>See generally</u> 20 C.F.R. § 416.926a (only "marked" and/or "extreme" limitations defined; only "marked" and/or "extreme" limitations to be found in determining functional equivalence for disability).

The administrative finding that T.W.'s impairments did not result in marked or extreme limitations is not required to be set aside merely because the ALJ failed to delineate the specific level at which T.W. experienced *less than* marked limitations. <u>See Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004) (administrative finding not required to be set aside when arguable deficiency in opinion-writing technique has no bearing on outcome); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992) (same); <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987) (same). In addition, in the domain of Acquiring and Using Information, the ALJ recited evidence demonstrating T.W.'s present ability to function in that domain. (Tr. 15.) Because the ALJ did not rely exclusively on T.W.'s "readiness" to function in finding her limitations not to be marked or extreme, such statement of "readiness" does not *in itself* require the finding to be reversed.

See <u>Strongson</u>, 361 F.3d at 1072.

However, as discussed <u>infra</u> at Section VI.B.2, because the ALJ failed to consider how T.W. would function outside of the highly structured and supportive setting provided by MSD, the ALJ's substantive analysis of T.W.'s functional limitations in all of the domains of functioning cannot be said to be supported by substantial evidence on the record as a whole, and this cause should be remanded for further proceedings.

2.  *Structured Settings*

> A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting. Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. Even if you are able to function adequately in the structured or supportive setting, *we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.*

20 C.F.R. § 416.924a(b)(5)(iv)(C).  (Emphasis added.)

A structured or supportive setting may include a residential facility or school where a child-claimant may live for a period of time, or adjustments made at home to accommodate the impairment(s). 20 C.F.R. § 416.924a(b)(5)(iv)(B).

In this cause, contrary to the mandate of §

416.924a(b)(5)(iv)(C), the ALJ failed to consider the level to which T.W. could adequately sustain her functional abilities outside of the structured residential and educational settings provided by the Missouri School for the Deaf. See also 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments.").

In his summary of the evidence, the ALJ acknowledged that T.W. attended a school for the deaf and that plaintiff testified to T.W.'s improved behavior, socialization and academic performance since attending the school, with the ALJ characterizing plaintiff's testimony as T.W. having done "a complete turnaround" since she began attending the school. (Tr. 13.) The ALJ also noted T.W.'s social activities to include going to football games, cheerleading, playing volleyball and basketball, running track, and playing cards with a friend from school. In addition, the ALJ noted that T.W. testified that she is more comfortable around deaf people. (Tr. 13.) In his evaluation of the various domains of functioning, the ALJ relied on Ms. Ripley's September 2006 report, MSD's January 2005 IEP and Ms. Henkhaus's one-time consultative examination and found that such evidence demonstrated T.W.'s functional limitations in each domain not to rise to such a level that they could be considered marked or extreme. (Tr. 15-17.)

As shown by the ALJ's discussion, the ALJ considered T.W.'s structured setting and indeed relied on evidence as to how T.W. performed within this structured setting to find T.W. not to be markedly or extremely limited in any domain of functioning. However, the ALJ wholly failed to consider the degree of limitation in functioning T.W. would have *outside* of this structured setting. Even if T.W. was able to function adequately in the structured or supportive setting, as the ALJ found she could, the ALJ was nevertheless required to consider T.W.'s functioning in other settings and whether she would continue to function at an adequate level without the structured or supportive setting. 20 C.F.R. § 416.924a(b)(5)(iv)(C).[3]

---

[3]To the extent it may be argued that Ms. Henkhaus's one-time examination provides substantial evidence demonstrating T.W.'s ability to function outside a structured setting, the undersigned notes the Regulations to emphasize that relatively *lesser* weight should be given to such one-time evaluations performed away from the child-claimant's usual settings and routines. See 20 C.F.R. § 416.924a(b)(6).

> Children may function differently in unfamiliar or one-to-one settings than they do in their usual settings at home [or] at school . . . you may appear more or less impaired on a single examination (such as a consultative examination) than indicated by the information covering a longer period. . . . We will look at your performance in a special situation and at your typical day-to-day functioning in routine situations. We will not draw inferences about your functioning in other situations based only on how you function in a one-to-one, new, or unusual situation.

Id.

To accord great weight to the opinion of a one-time consulting

Although the ALJ extensively cited T.W.'s participation in extracurricular and social activities, such as cheerleading, going to football games and playing cards with friends, he failed to acknowledge that even these activities occurred within the supportive setting of MSD. Nor did the ALJ address relevant evidence of T.W. performing below grade level on standardized testing prior to her enrollment at MSD, or that T.W. did not engage in any extracurricular activities outside of MSD. In addition, the ALJ failed to address in his decision the January 2006 IEP in which numerous behavioral problems were identified by MSD staff. Although an ALJ is not required to explain all the evidence of record, Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000), he nevertheless cannot merely "pick and [choose] only evidence in the record buttressing his conclusion." Taylor o/b/o McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004), and cases cited therein.

> The ALJ may have considered and for valid reasons rejected the . . . evidence proffered . . . ; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain evidence. Accordingly, remand is necessary to

---

examination would be error, especially in the absence of any rationale discounting the opinions and observations made by those with a longitudinal history of working with a child-claimant's impairments.

fill this void in the record.

*Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995) (citation omitted).

A review of the ALJ's decision shows the ALJ not to have recognized that T.W.'s improvements in functioning occurred within the context of a highly structured and supportive setting, without considering T.W.'s ability to function in a non-structured setting. *E.g.*, *McClain v. Barnhart*, 299 F. Supp. 2d 309, 326 (S.D.N.Y. 2004). Without any discussion or analysis as to how T.W. would function outside of her supportive setting, this Court is left to weigh the evidence itself, speculate as to whether or why the ALJ may have rejected certain evidence, resolve any inconsistencies and ambiguities, and see if it could reach the decision that T.W.'s functional limitations would continue not to render her disabled. This the Court cannot do. *Jones*, 65 F.3d at 104; *Taylor*, 333 F. Supp. 2d at 857. Nor is it the role of the Court to search the record for factual bases to support the ALJ's decision. *Taylor*, 333 F. Supp. 2d at 857.

In light of the record, the ALJ's failure to acknowledge certain evidence, and his failure to consider whether T.W. could function at an adequate level outside of a structured or supportive setting, the Court is unable to determine whether the ALJ properly considered T.W.'s limitations in the various domains of functioning, and thus cannot conclude that substantial evidence

supports the ALJ's findings.  <u>Taylor</u>, 333 F. Supp. 2d at 857; <u>see also</u> <u>McClain</u>, 299 F. Supp. 2d at 326.  Accordingly, remand is necessary "to fill [the] void in the record." <u>Jones</u>, 65 F.3d at 104; <u>see also</u> <u>Savino-Nixon v. Astrue</u>, 479 F. Supp. 2d 1176, 1183 (D. Kan. 2007).

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **June 16, 2008.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this  _4th_  day of June, 2008.